**Opinion issued June 6, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NOS. 01-11-00651-CR & 01-11-00652-CR

———————————

**GREGORY BERNARD STATIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 228th District Court
Harris County, Texas
Trial Court Case No. 123986301010 & 123986401010

**MEMORANDUM OPINION ON REHEARING**[*]

A jury convicted appellant Gregory Bernard Statin of possession with intent to deliver cocaine weighing between 4 and 200 grams (trial court case no. 1239863, appellate court case no. 01-11-00651-CR), *see* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D), 481.112(a), (d) (West 2010), and of unlawful possession of a firearm by a felon (trial court case no. 1239864, appellate court case no. 01-11-00652-CR). *See* TEX. PENAL CODE ANN. § 46.04(a), (e) (West 2011). The trial court assessed punishment of 25 years in prison for possession of cocaine and 10 years in prison for possession of a firearm, with the terms to run concurrently. On appeal, Statin argues that the trial court erred by denying his motion to suppress evidence and by not giving the jury a requested instruction relating to the lawfulness of a search. Finding no error, we affirm.

## Background

In 2009, a task force of the Houston Police Department conducted surveillance on a condominium unit in southwest Houston, which the police believed was a place used for trafficking in narcotics. Officers involved with the surveillance briefed the officers who patrolled the area about their ongoing

---

[*] We originally issued our memorandum opinion in this appeal on March 12, 2013. Appellant, Gregory Bernard Statin, filed a motion for rehearing. We deny the motion for rehearing, withdraw our previous memorandum opinion, vacate our prior judgments, and issue this memorandum opinion and the related judgments in their stead.

investigation. Statin and his girlfriend, Monique Harris, owned apartment 207, which was the unit that was under surveillance. Statin also owned apartment 201.

One afternoon Statin offered to drive Harris's sister-in-law, Yolanda Brown, to an appointment. On the way they picked up another passenger, who rode in the back seat. Statin left the condominium complex, made a u-turn without signaling, and was stopped by Houston Police Department Officers Tran and Gandingco for a traffic violation. The officers were patrolling the area when they stopped Statin's truck; they were not conducting surveillance. Tran testified that as he approached the driver's side, "immediately I detected an odor of marijuana in the vehicle." The officers asked Statin, Brown, and the other passenger to get out of the truck, and they separated them. Although Statin was cooperative, Tran noticed that the other passenger was not, so he handcuffed Statin and put him in the back seat of a patrol car. When Statin provided his identification, Tran recognized the name and remembered that he was the target of the investigation and surveillance of apartment 207 in the nearby condominium complex. Tran immediately contacted the tactical unit supervisors, Houston Police Department Sergeants Sims and Garza, who arrived at the scene of the traffic stop within 20 minutes.

Houston Police Department Officer J. Oliver was assigned to the tactical unit in southwest Houston that worked with issues involving gangs, narcotics, and

3

homicide. When he heard about the traffic stop of Statin over the radio, he went to the scene of the traffic stop to help with the investigation.

When Tran returned to the truck, he saw a crack pipe in plain view "on the driver's seat by the middle console." After a field test of the residue in the crack pipe was positive, Statin was arrested for possession of a controlled substance.

Yolanda Brown, who was the front-seat passenger in Statin's car, testified that after the officers took the keys from the truck's ignition, they then asked Statin if they "could go to his house." According to Brown, Statin declined and inquired why the officers were going to his house. When asked about Statin's attitude at the time, she reiterated: "He told them no. He was upset and he said no. He said don't go to my house. What you going to my house for?" She further testified, "They said nothing else. They just took the keys and burned off and went to the apartments."

At a hearing on his motions to suppress, Statin testified similarly. He said, "The police officer came over there. They already had my keys. And he came over there. He said, 'Oh, we're going to your house.' And he asked me could he go, and I told him, 'No. What you going to my house for?'" Both Statin and Brown conceded that they had prior felony convictions, and they both testified that the police officers conspired to and did plant the crack pipe in Statin's truck, a fact that the trial court stated informed his determination of these witnesses' credibility.

4

The officers who were present at the traffic stop testified that Statin refused to talk to them or that they did not ask or did not recall asking his permission to search his apartment.

Tran and several other officers went to apartment number 201, which belonged to Statin. They knocked, and Monique Harris answered the door. She said that she and Statin lived there, and she had keys and was able to control her barking pit bulls that were present. The officers informed her that Statin was in custody and that they were conducting an investigation. They asked for and obtained her consent to search apartment 201.

Harris secured her dogs and permitted the police to search apartment 201 with a narcotics-sniffing police dog. In addition, Harris pointed out the presence of a gun, which Officer Oliver said was "[i]n the bedroom in the closet in plain view." Harris told the officers that the gun was hers and that she had a receipt for it.

Oliver stayed with Harris during the search of apartment 201, and afterward he asked for her consent to search apartment 207. Harris told the officers that she and Statin were remodeling it in anticipation of a move. Harris was reluctant to consent to a search of apartment 207. Oliver said, "She was concerned about herself, if anything was found in there . . . what was going to happen." After speaking to an attorney, she consented in writing to the search of the other

5

apartment. At trial, evidence was introduced that showed Harris and Statin jointly owned apartment 207.

In apartment 207, police found plastic containers of marijuana and a 9-millimeter pistol with 12 live rounds. In a closet, they also found a bag containing 190 individually foil-wrapped portions of crack cocaine, which officers estimated would sell for $20 each. The apartment also contained utensils for cooking crack cocaine, a beaker with trace amounts of residue, a spoon, a wick, and a scale. Statin's name appeared on bills, tax returns, and dry cleaning receipts found in the apartment.

Statin filed a motion to suppress evidence pertaining to both the firearm and drug charges. Before trial, the court told the parties that it would hear the motion as it heard the case. Because the motion to suppress dealt with an issue that would have been completely decisive of the case, and because the court told Statin that it wanted to carry the motion to suppress with the case, the motion to suppress was not untimely and was sufficient to preserve Statin's complaint for appeal. *See Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004). Defense counsel repeatedly raised his objections to the admission of evidence and the court continually noted that the evidence was conditionally admitted. At one point, the court stated specifically that it wanted the appellate record to be clear that the

6

defendant had objected, "So, I just want to make sure that everybody reading this record understands that counsel has not waived his objection to this."

After the State rested its case, the trial court conducted a hearing on Statin's motion to suppress. Statin based his motion on constitutional grounds, arguing that under *Georgia v. Randolph*, 547 U.S. 103, 120, 126 S. Ct. 1515, 1526 (2006), Harris's consent was invalid as to evidence to be used against Statin because he expressly denied consent by saying, "Don't go to my house." At the suppression hearing, Statin's lawyer said, "I agree that Monique Harris had the right to give consent to search the house. . . . But that consent is only good against her. It's not good against this man because he refused consent." The trial court found that there was no question that Harris's consent was voluntary. The court overruled the motion to suppress and admitted all the evidence that previously had been admitted conditionally.

Statin objected to the jury charge and requested that the court instruct the jury to disregard the evidence against him if they had a reasonable doubt that the search of his home was without his consent. He argued that as in *Randolph*, he "was present and made his objection known . . . directly to the police." Counsel specifically argued:

> This defendant, although not physically at the house, was physically present for all other purposes. In that physically he was located within blocks of his house. That he had the keys to his house. That when the keys were taken from him, he told the police officer at

the time I do not want you to search my house. And I don't believe that the Court will require him to be standing physically looking at his house and saying don't search that house belonging to me. I think this law was created for situations where somebody can give or refuse consent. The correlative of that law which would allow the police officer to get consent from a—a person authorized to give that consent is when the other owner is not present. They can't get the other owner. They don't know where the other owner is. The owner is not there. They have to wait for the other owner to come. Those facts are not present here. The other owner is actually being held by the police at another location. They could have easily brought him to the house, but they chose not to, to circumvent the law by not letting him be at that house and look at it and say I'm present, hey, you can't search the house. So, he . . . told them he didn't want the house searched. For that reason, I think the charge should read that if you have reasonable doubt that the search of the defendant's home was without his consent . . . . Then you should not consider the evidence against him in this case.

The trial court overruled Statin's objection to the charge, noted that his complaint was preserved, and explained:

[T]here's two things. One, I made my ruling on the motion to suppress. . . . And, of course, in large part that ruling was a product of . . . credibility of the witnesses. But having said that, I still think that this is a question that needs to be answered. I think it's a significant question. And I'm just going to say that even in the event that what your client said and his witnesses said were true, I don't believe that they're entitled to the charge because they weren't present and there was a person there at the house that had authority to give the police officers that consent. . . . So, just essentially the opposite of what you said.

The court's charge instructed the jury that a search of Statin's home—apartment 207—"without a search warrant or without his consent or the consent of

8

another resident would not be lawful." It defined "consent" as "assent in fact, whether expressed or apparent." The charge then stated:

> Therefore, in this case, if you have a reasonable doubt that the search of the defendant's home located at Apartment 207 . . . , if any, was without the defendant's consent or the consent of Monique Harris, if any, or said consent was not freely and voluntarily given, then you will wholly disregard such evidence found in the residence, if any, and not consider it as any evidence whatsoever.

The jury found Statin guilty of both charges, and Statin appealed.

## Analysis

### I.    Motion to suppress

Statin's first issue complains that the court erred in overruling his motions to suppress evidence. We review a ruling on a motion to suppress for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part the testimony of a witness. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as in this case, the trial court

9

makes no explicit findings of fact, we imply fact findings that support the trial court's ruling so long as the evidence supports the implied findings. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). Although appellate courts generally limit their review of the trial court's ruling to an examination of the evidence produced at the suppression hearing, because the court heard the motion to suppress after the State's case-in-chief, we will consider all of the evidence that was before the court at the time of its ruling. *See id.* at 687.

"Under the Fourth and Fourteenth Amendments, a search conducted without a warrant based on probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973)). Consent to search is one such specifically established and well-delineated exception. *Id.*; *see Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043. Consent must be voluntary. *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010) (citing *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043–44). Voluntariness is a question of fact, and whether a law enforcement officer acts reasonably in relying on consent is determined from the totality of the circumstances. *Meekins*, 340 S.W.3d at 458–59. Federal law requires that the State prove voluntary consent by a preponderance of the evidence;

Texas law requires that the State prove voluntary consent by clear and convincing evidence. *Id.* at 459–60.

"A third party can consent to a search to the detriment of another's privacy interest if the third party has actual authority over the place or thing to be searched." *Hubert*, 312 S.W.3d at 560. "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *U.S. v. Matlock*, 415 U.S. 164, 170, 94 S. Ct. 988, 993 (1974); *accord Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990). But when a co-tenant is physically present and expressly refuses consent to search, a warrantless search is unreasonable. *Georgia v. Randolph*, 547 U.S. 103, 120, 126 S. Ct. 1515, 1526 (2006). In *Randolph*, the Supreme Court distinguished the facts of that case from *Matlock* and other earlier authority that upheld a co-tenant's voluntary consent as constitutionally reasonable. The Court explained:

> If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
>
> This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's

11

permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Id.* at 121–22, 126 S. Ct. at 1527.

In this case, Statin was arrested away from his apartment, based on a traffic violation and the subsequent discovery of a controlled substance. Thus, he was physically absent from the apartment and not involved in the threshold colloquy. Nothing in the record shows that the police removed him "from the entrance for the sake of avoiding a possible objection." *Id.*

Statin urges this court to follow *United States v. Murphy*, 516 F.3d 1117 (9th Cir. 2008), which held:

If the police cannot prevent a co-tenant from objecting to a search through arrest, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made. Nor, more generally, do we see any reason to limit the *Randolph* rule to an objecting tenant's removal by police. Once a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects.

*Murphy*, 516 F.3d at 1124–25. Statin argues that the court erred in denying his motion to suppress because the search was conducted over his objection. But the evidence at trial and at the suppression hearing conflicted as to whether Statin actually objected to the officers' search of his apartment. Both Brown and Statin testified that, while holding Statin's keys, one of the arresting officers told Statin that they were going to his apartment and Statin replied, "No," and asked why they

12

would do that.  But the officers who were present at the traffic stop testified that Statin refused to talk to them or that they did not ask or did not recall asking his permission to search his apartment.  On a motion to suppress, the trial court is the sole judge of the credibility of the witnesses, and although the court did not make written findings of fact, the judge said that he found the officers' testimony on this question to be credible.  *See Maxwell*, 73 S.W.3d at 281.  Based on the court's comments and denial of the motion to suppress, we conclude that the court rejected Brown's and Statin's testimony that Statin objected to the search of his apartment. *See Gutierrez*, 221 S.W.3d at 687.  In light of this implied credibility determination, *Murphy*, which necessarily requires a finding that the defendant objected to the search, is not applicable to Statin's case.

Moreover, not all circuit courts agree with the Ninth Circuit's holding in *Murphy*.  For example, the Fifth, Seventh, and Eighth Circuits have recognized that under *Randolph*, "the objection of an absent cotenant does not vitiate the consent of a physically present cotenant."  *U.S. v. Cooke*, 674 F.3d 491, 499 (5th Cir. 2012); *accord U.S. v. Henderson*, 536 F.3d 776 (7th Cir. 2008); *U.S. v. Hudspeth*, 518 F.3d 954 (8th Cir. 2008) (en banc).  The Fifth Circuit explained:

> We agree with the Seventh and Eighth Circuits that the objection of an absent cotenant does not vitiate the consent of a physically present cotenant under *Randolph*.  First, as both courts noted, *Randolph* self-consciously emphasized the importance of Randolph's presence by repeatedly noting it when declaring and reiterating the holding.  *See Randolph*, 547 U.S. at 106, 114, 121, 122,

13

123, 126 S. Ct. 1515. Justice Breyer's concurrence confirms the importance of physical presence. *Id.* at 126, 126 S. Ct. 1515 (Breyer, J., concurring). Second, the *Randolph* Court seemed to have structured the holding as an exception to the general rule of *Rodriguez* and *Matlock* that a cotenant may consent to the search of a residence, *id.* at 106, 126 S. Ct. 1515, and that this exception was narrowly drawn along a "fine line." *Id.* at 121–22, 126 S. Ct. 1515. Third, although it is a close question, social convention normally allows for a visitor to feel invited into a home when invited by a physically-present resident, even if an absent cotenant objects to it, rather than the visitor's assuming he is verboten forever until the objector consents.

*Cooke*, 674 F.3d at 499.

Statin's issue is not controlled by *Randolph* because Statin was not physically present at the time of the search. Rather, the principle announced in *Matlock* and *Rodriguez* is controlling of the outcome of this issue. That is, Harris possessed common authority over apartment 207, Statin was absent, and Harris consented to the search in Statin's absence. We hold that the trial court did not err by denying Statin's motions to suppress, and we overrule this issue. *See Matlock*, 415 U.S. at 170, 94 S. Ct. at 993; *Rodriguez*, 497 U.S. at 181, 110 S. Ct. at 2797.

## II. Article 38.23 jury instruction

In his second issue, Statin contends that the trial court erred in failing to give the jury the instruction he requested pursuant to Code of Criminal Procedure article 38.23(a), which provides:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be

admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). A defendant's right to the submission of an instruction under article 38.23(a) "is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible." *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007). Before a defendant is entitled to the submission of a jury instruction under article 38.23(a), he must meet three requirements:

(1)     the evidence heard by the jury must raise an issue of fact;

(2)     the evidence on that fact must be affirmatively contested; and

(3)     that contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence.

*Madden*, 242 S.W.3d at 510.

Statin asked the court to instruct the jury that "if you have reasonable doubt that the search of the defendant's home was without his consent . . . [t]hen you should not consider the evidence against him in this case." While there was a question of fact as to whether Statin expressly denied consent to search his home, this question was not material to the lawfulness of the challenged conduct because

15

the officers acted lawfully by obtaining Harris's consent. Moreover, the court did give the jury an appropriate Article 38.23 instruction. It said:

> . . . in this case, if you have a reasonable doubt that the search of the defendant's home located at Apartment 207 . . . if any, was without the defendant's consent or the consent of Monique Harris, if any, or said consent was not freely and voluntarily given, then you will wholly disregard such evidence found in the residence, if any, and not consider it as any evidence whatsoever.

We hold that the trial court did not err by refusing to give Statin's requested jury instructions. We overrule this issue.

## Conclusion

We affirm the judgments of the trial court.


Michael Massengale
Justice

Panel consists of Justices Keyes, Massengale, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).